Approved: ꧁ꪑꪀᦓꪝꪮꫀᦔ꧂
ANDREA M. GRISWOLD/MARTIN S. BELL
Assistant United States Attorney

Before: THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

**14 MAG. 1734**

------------------------------------X
 :
UNITED STATES OF AMERICA :
 : **COMPLAINT**
 - v - :
 : Violations of
DERVAL LAZZARI, : 18 U.S.C. §§ 1343
 a/k/a "Eduardo," and 1349
 :
 Defendant. : COUNTY OF OFFENSE:
 : NEW YORK
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss:

JASON SAMUELS, being duly sworn, deposes and says that she is a Criminal Investigator with the United States Attorney's Office, Southern District of New York, and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

1. From at least in or about 2006 through at least in or about February 2013, in the Southern District of New York and elsewhere, DERVAL LAZZARI, a/k/a "Eduardo," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Section 1343.

2. It was a part and an object of the conspiracy that DERVAL LAZZARI, a/k/a "Eduardo," the defendant, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations or promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, LAZZARI, and others known and unknown, acting as an owner of a company contracted by the New York City Department of

Education (the "DOE") to repair and service equipment and outlets at New York City Schools, prepared and electronically submitted fraudulent invoices to the DOE in which the DOE was billed more than a million dollars for parts that were not installed and services that were not performed, and thereby obtained the payment of funds through the use of interstate electronic payments.

### Overt Acts

3. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a. Between 2006 and 2012, Acme electronically submitted more than 8,000 invoices to the DOE, each requesting payment of $157.50 for "carbon dioxide testing" represented to have been conducted on refrigerators located at DOE schools.

   b. Between 2006 and 2012, Acme electronically submitted dozens of invoices to the DOE requesting payment of $572.05 for a circuit breaker estimated to cost $18.00.

(Title 18 United States Code, Section 1349.)

### COUNT TWO
### (Wire Fraud)

4. From at least in or about 2006 through at least in or about February 2013, in the Southern District of New York and elsewhere, DERVAL LAZZARI, a/k/a "Eduardo," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, LAZZARI devised and carried out a scheme to defraud the DOE by, preparing and electronically submitting fraudulent invoices in which the DOE was billed more than a million dollars for services that were not performed and parts that were not installed; and in furtherance of the scheme, LAZZARI transmitted and caused to be transmitted interstate wire communications to and from New York, New York.

(Title 18, United States Code, Sections 1343 & 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.  I am a Criminal Investigator with the United States Attorney's Office, Southern District of New York, and have been so employed since approximately June 2014. Prior to that time, I was a Special Agent with the Department of Homeland Security, Homeland Security Investigations, for approximately twelve years. I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, and my review of documents and conversations that I have had with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents, and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### The Scheme

8.  Based on the information provided herein, I respectfully submit that there is probable cause to believe that DERVAL LAZZARI, a/k/a "Eduardo," the defendant, an owner at a company contracted by the DOE to repair and service kitchen equipment and electrical outlets at New York City Schools, engaged in a multi-year scheme to submit fraudulent invoices to the DOE in order to cause resources allocated for repair and service of kitchen equipment and electrical outlets in New York City schools, to be diverted to themselves and to other people who were not entitled to them. Specifically, there is probable cause to believe that LAZZARI deliberately and systematically billed the DOE for (a) vastly more expensive replacement parts than were actually installed; (b) parts that were never installed; and (c) services that were unnecessary and/or never performed.

### Background

9.  I have spoken to, and reviewed notes and reports generated by, several investigators assigned to the Special Commissioner of Investigation for the New York City School

District ("SCI").[1]  Based on these conversations and review of documents, and on my training and experience, I have learned the following:

### The ACME-DOE Contracts

10. Acme American Repairs, Inc. ("Acme Repairs") is a New York based entity owned in approximately equal shares by DERVAL LAZZARI, a/k/a "Eduardo," and another ("Owner-2"). Acme American Refrigeration, Inc. ("Acme Refrigeration," collectively, "Acme") is an affiliate of Acme Repairs owned in equal shares by LAZZARI, Owner-2, and a third Owner ("Owner-3").

11. Between 2005 and 2013, Acme was contracted to perform certain repair and service work at DOE schools under two contracts:

   a. In approximately 2005, the DOE awarded Acme a contract for the repair of cafeteria equipment at DOE schools located in New York City (the "2005 Contract"). The 2005 Contract was in effect from approximately January 2006 through October 2010 and had an estimated value of $7.5 million. Under the 2005 Contract, Acme was required to repair cooking units at schools in the Bronx and Queens, refrigeration equipment in Queens, and steel kitchen equipment throughout the City. Under the 2005 Contract, the DOE agreed to pay Acme an hourly fee for the labor of its repair technicians plus the manufacturer's list price for each part installed, minus an agreed discount. In total, the DOE paid Acme more than $22 million under the 2005 Contract.

   b. In 2010, the DOE awarded Acme a second DOE contract which, like the 2005 Contract, included repair of steel kitchen equipment, but added the connection and disconnection of appliances to and from the electric power sources and electrical outlet repair (the "2010 Contract"). The 2010 Contract was in effect from approximately May 2011 through February 2013 (when DOE stopped doing business with Acme) and had an estimated value of $1.76 million. The pricing scheme was similar to the agreement under the 2005 Contract and consisted of an hourly fee for labor plus a discounted price for parts installed. In

---

[1] In 2012, SCI began investigating allegations that Acme had engaged in fraudulent billing practices in connection with its contracts with the Department of Education. In connection with that investigation, SCI investigators reviewed invoices submitted by Acme to the DOE, conducted site inspections at certain schools to compare installed parts with those listed on Acme invoices, and interviewed more than a dozen current and former Acme employees and technicians.

total, the DOE paid Acme more than $1 million under the 2010 Contract.

### Billing Process

12.  In 2012 and 2013, several employees and principals of Acme, including DERVAL LAZZARI, a/k/a "Eduardo," the defendant, as well as several Acme technicians, testified under oath before the SCI. In 2013 and 2014, the United States Attorney's Office for the Southern District of New York also conducted consensual interviews of a number of former and current Acme employees, including several Acme technicians. Based on my review of draft transcripts and notes generated from these interviews and testimony, I have learned the following about Acme's process for performing work pursuant to the Acme-DOE contracts:

   a.  The process was initiated by a document commonly referred to by Acme employees as a "service order" which consisted of a request from a DOE school for repair or service. Service orders were emailed to Acme from the DOE. A service order would typically be received by a dispatcher stationed at a service desk, who would then assign the service order to an available Acme technician.

   b.  Once assigned a service order, the assigned Acme technician traveled to the DOE school and completed the repair. In connection with each assignment, the assigned Acme technician filled out a "work ticket" on which the technician would handwrite, among other things, the name and/or location of the school, the type of equipment requiring repair, a narrative description of the work and a list of the materials used in connection with the repair.[2] Acme technicians would typically return to the Acme office and submit their work tickets at the end of each day.

   c.  For work tickets relating to Acme Repair, LAZZARI reviewed the work tickets and prepared the corresponding invoices. LAZZARI was assisted by a billing clerk (the "Billing Clerk") discussed in more detail below. For work tickets relating to Acme Refrigeration, Owner-3 reviewed the work tickets and prepared the corresponding invoices. Completed invoices were submitted to the DOE in both paper form and via electronic mail. The DOE paid the Acme invoices via electronic

---

[2]   In a minority of cases, the Acme technician would not be able to complete the job on the first visit for various reasons, including that the technician did not have the required parts necessary to complete the repair.

wire transfer from a DOE bank account to an Acme bank account. These wires travelled in interstate commerce.[3]

## THE FRAUD

13.   In approximately May 2014, the Billing Clerk testified before a federal criminal grand jury in the Southern District of New York, pursuant to an order of immunity signed by a United States District Judge.  The Billing Clerk was employed by Acme from at least 2005 through 2013,  From reviewing a transcript of the Billing Clerk's testimony, I have learned the following:

   a.   DERVAL LAZZARI, a/k/a "Eduardo," the defendant, controlled the process for reviewing work tickets for repairs of equipment at DOE schools other than refrigeration equipment for the period of at least 2006 through February 2013.

   b.   At the direction of LAZZARI, the Billing Clerk handled the review of technician work orders and the preparation of corresponding invoices to be submitted to DOE for repairs and services other than refrigeration repair.  The Billing Clerk assisted LAZZARI in the fraudulent practice from approximately 2006 until the DOE terminated its contracts with Acme in February 2013.

   c.   Beginning shortly after the 2006 Contract went into effect, LAZZARI instructed the Billing Clerk "to bill as close to $1,000 on every work ticket as possible without going over."[4]  In connection with his instructions, LAZZARI provided the Billing Clerk with a list of parts to choose from in creating the DOE invoices.  For example, if the technician's work ticket indicated that an outlet had been installed at a DOE school, the Billing Clerk selected an outlet from the list of parts provided by LAZZARI.  The Billing Clerk would select an outlet that would result in the particular invoice totaling as close to $1,000 as possible, typically the most expensive outlet.

   d.   No effort was made to determine what actual part was installed at the particular DOE school, nor was any

---

[3]   From speaking with a representative of the bank used by the DOE to pay the Acme invoices, I learned that the DOE made those payments by wire transfer that travelled in interstate commerce.

[4]   Invoices over $1,000 triggered additional review by the DOE.

effort made to determine the cost to Acme of purchasing the installed part.

   e. Shortly after Lazzari instructed the Billing Clerk to prepare the invoices in the manner described, the Billing Clerk asked LAZZARI whether the practice was appropriate.  The Billing Clerk testified that Lazzari told him/her "not to worry about it," and to "do what [she] was told."  Sometime later, when the fraudulent practice described above had been ongoing for a matter of years, the Billing Clerk again approached LAZZARI to express that she was "not comfortable, that [she] didn't think this was right."  LAZZARI's response was again "do what I tell you to do, don't worry about it."  The Billing Clerk believed that if she refused to assist LAZZARI she would lose her job.

### Site Visits to DOE Schools

   14. Based on my conversations with SCI Investigators, I know that in addition to the review of Acme invoices submitted to the DOE, SCI investigators conducted site visits of certain DOE schools to determine the cost of certain parts actually installed by Acme.  From speaking with SCI investigators about these site visits and their review of corresponding invoices Acme submitted to the DOE, I have learned the following:

   a. Acme systematically charged the DOE for significantly more expensive versions of equipment or parts than were actually installed in DOE schools.  For example:

    i. Acme repeatedly billed the DOE $572.05 for a circuit breaker estimated to cost $18.00.

    ii. Acme repeatedly billed the DOE between $200 and $300 for electrical outlets estimated to cost between $2 and $22.

   b. Acme also billed the DOE for parts or services that that were not installed and/or were inapplicable to the type of repair and/or service work completed.  For example:

    i. Acme repeatedly billed the DOE $196.99 for a cover plate in connection with Acme's repair of an electrical outlet.  The cover plate, which is designed for use on a specialized steamer appliance, is inapplicable to electrical outlets.

          ii.    Between 2006 and 2012, Acme invoiced the DOE $157.50 more than eight thousand times for a "leak test" of refrigerators purported to use carbon dioxide, even though during the same period Acme was typically billing non-DOE schools between $15 and $65 for a "leak test."

          15.    Based on my review draft transcripts and notes generated from these testimony and interviews conducted by SCI Investigators and the United States Attorney's Office, I have also learned that carbon dioxide is not used in connection with conducting a leak test of refrigeration equipment. In fact, the carbon dioxide test Acme billed to the DOE in connection with leak tests of refrigeration equipment is actually used for air testing in cooking and heating equipment, and has no application for refrigeration equipment.

    WHEREFORE, deponent prays that defendant be imprisoned, or bailed, as the case may be.

_____
JASON SAMUELS
Criminal Investigator
United States Attorney's Office
Southern District of New York


Sworn to before me this
7th day of August, 2014

_____
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK